**Michael Lee VIT, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 94–288.

Supreme Court of Wyoming.

Jan. 5, 1996.

Dan Davis, Gillette, for Appellant.

William U. Hill, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General, Mary Beth Wolff, Senior Assistant Attorney General, Cheyenne, for Appellee.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

THOMAS, Justice.

The major issue in this case related to the constitutionality of the Wyoming stalking statute, WYO.STAT. § 6–2–506 (Supp.1993). After the appeal was filed, the constitutionality of the Wyoming statute was resolved in *Luplow v. State; Jennings v. Currier,* 897 P.2d 463 (Wyo.1995). The remaining issues address trial errors including the admission of statements made by Michael Lee Vit (Vit)

to a psychologist; the admissibility of other statements made by Vit; error in excluding testimony relating to statements made by Vit to a neighbor explaining Vit's mood on a particular occasion; the absence of a certification of familiarity by a different judge; and limitations upon voir dire examination of the jury panel. We discern no reversible error in any of the contentions made by Vit, and the judgment of the trial court and the separately-entered sentence are affirmed.

In the Appellant's Brief, the issues presented for review are recited as:

1. Is Wyoming's Stalking Statute unconstitutionally vague and overbroad?

2. Did the trial court err by denying the defendant's first motion in limine concerning the relevancy of statements made by the defendant to a psychologist revealing thoughts of violence?

3. Did the trial court err by denying the defendant's first motion in limine having to do with the privileged status of communications made to a psychologist during counseling?

4. Did the trial court err by denying the defendant's second motion in limine concerning the relevance of Kimi Manor's testimony concerning the defendant's speculative statement that he may have killed Jeanie Vincent had he not "found the lord?"

5. Did the trial court err when it did not allow the testimony of the neighbor of the victim that while the stalking incidents were allegedly going on, he gave the defendant a ride home early in the morning, and the defendant was in a very good mood because as the defendant explained to the man, he had just spent the night with his girl friend, and he thought he could patch things up, and other similar proposed evidentiary errors?

6. Did the new court err in not certifying familiarity with the case upon taking over the trial?

7. With regard to voir dire, may a party poll each juror for his answer to questions asked of the panel?

8. Do the above errors of the trial court, singly or together warrant reversal?

In the Brief of Appellee, this statement of the issues appears:

I. Whether W.S. §§ 6–2–506 et. seq. is unconstitutionally vague or overbroad?

II. Whether the procedure followed during voir dire was proper?

III. Whether the trial court properly ruled on evidentiary issues?

In accordance with our usual approach, we view the evidence in the light most favorable to the State. As is frequently true in stalking cases, a personal relationship existed between Vit and the victim. They dated from the middle of 1991 until May of 1993 and, during part of that time, the victim rented a room in her home to Vit. In May, because Vit's "moods kept getting worse," the victim decided to terminate the relationship. Not long after, Vit moved out of the victim's home, but he did not take the termination of the relationship well. On September 14, 1993, around 11:00 p.m., Vit went to the victim's home and pounded on the door. She went to her bedroom window, opened it, and asked him to leave. Vit told her he was not leaving unless she let him in and talked to him. The victim then called 911 for assistance. During the phone call, Vit drove his car closer to her house yelling that he would drive right through her house if she did not let him in. He broke the glass out of her bedroom window and left.

As a result of the September incident, Vit was charged with property destruction, trespassing, driving under the influence, driving under suspension, and eluding a police officer. He was released on bail, and one of the conditions of bail was that he have no contact with the victim. A few days later, he went to the victim's house with a card and some money he owed her. He apologized for the trouble he had caused and left. Several days later, he again went to the victim's residence and pushed her living room window out of the track, trying to effect entry. The victim's daughter called the police. About a week after that, Vit went to the victim's place of employment, seeking to talk to her. She told him he was not supposed to be there, and he left after asking her not to call the police.

Vit was sentenced to a term of 120 days in the county jail after he pleaded guilty to charges of criminal trespass and property destruction. All but sixty days of that sentence was suspended, and he was placed on probation for six months. One of the conditions of probation was that Vit not have any contact, direct or indirect, with the victim. Vit was released from the county jail about December 10, 1993.

Two days later, he went to the victim's residence, and she warned him he was not supposed to be there. He left but, about a week later, he came to the victim's residence with Christmas gifts for her and her daughter. He spoke briefly with the victim, delivered the gifts and left. He then called the victim on December 26, 1993. He apparently was feeling sorry for himself because he had a lousy Christmas, and he accused the victim of being at a bar with her new "blond boyfriend." That comment led the victim to believe Vit had been following her, and she told him to desist. That made Vit angry, and the conversation turned into an argument in which Vit began yelling and screaming at the victim. She hung up.

The next day, the victim tried to telephone her mother and found her phone was dead. Her son stopped by shortly after she made that discovery, and she told him about the phone. When her son checked the lines, he found they had been pulled out, and the junction box was missing. That caused immediate concern to the victim who assumed Vit had been the one who pulled out the telephone lines. She asked her son to go to her mother's home to contact the telephone company and have the phone fixed.

When the victim's son returned from that errand, an officer of the sheriff's department was arriving at the victim's house. Vit had called a friend the night before and advised the friend he had pulled out the victim's phone lines and was afraid of what he might do. He stayed that night with the friend and the friend's wife. When the friend dropped him off the next day, Vit was headed toward the victim's house, and the friend contacted the sheriff's office, concerned Vit might do

something violent to the victim. The officer had come to the victim's home to communicate that information.

There was no contact by Vit on December 27 but, on December 28, he did appear and was lurking around the victim's house, peering in the windows. The victim and her son had ordered a pizza, and the delivery person saw Vit hiding behind the playhouse in the yard. The victim had seen a shadow just before and had asked her son to call the emergency phone number. She asked the pizza delivery person if he had seen anyone, and he said he had. He was aware that she was very frightened, but he left because he had left his car running. Sheriff's deputies responded to the emergency phone call from the victim's son, and Vit ran away. He was apprehended, arrested, and charged with felony stalking because he was in violation of his probation.

Vit was convicted, after a trial to a jury, and he was sentenced to a term of not less than fifteen, nor more than sixty, months in the state penitentiary with credit for 208 days previously served. Vit has appealed from that conviction and sentence.

In his brief, Vit initially contends that WYO.STAT. § 6–2–506 is unconstitutional because it is both vague and overbroad. That question was definitively resolved in *Luplow*, 897 P.2d 463. We discover that, subsequent to that decision, courts in other jurisdictions have continued to uphold such statutes. Appellate courts in Illinois, Michigan, Montana and Ohio have upheld the stalking statutes of those respective states. *People v. Bailey; People v. Coyne*, 167 Ill.2d 210, 212 Ill.Dec. 608, 657 N.E.2d 953 (Ill.1995); *People v. Holt*, 271 Ill.App.3d 1016, 208 Ill.Dec. 515, 649 N.E.2d 571 (1995); *People v. White*, 212 Mich.App. 298, 536 N.W.2d 876 (1995); *State v. Martel*, 902 P.2d 14 (Mont.1995); *State v. Dario*, No. C–940844, 1995 WL 553322 (Ohio Ct.App., Sept. 20, 1995). The appellate courts in Alabama and Florida have followed their previous cases ruling the stalking statutes in those states to be constitutional. *Ivey v. State*, No. CR–93–0659, 1995 WL 664637, —— So.2d —— (Ala.Crim.App., Nov. 9, 1995); *State v. Randall*, No. CR–94–1058, 1995 WL 576993, —— So.2d —— (Ala.Crim.

App., Sept. 29, 1995); *Williams v. State*, 658 So.2d 665 (Fla.Ct.App.1995); *State v. Gonzalez*, 651 So.2d 185 (Fla.Ct.App.1995). The United States District Court for the District of Connecticut has refused to enjoin the enforcement of the Connecticut statute, noting the plaintiff failed to establish the likelihood of success in establishing that the Connecticut statute was either overbroad or void for vagueness. *Champagne v. Gintick*, 871 F.Supp. 1527 (D.Conn.1994). Vit's claim of unconstitutionality of the stalking statute is without merit.

Vit then contends he was prejudiced by erroneous evidentiary rulings by the trial judge. In his issues, those are identified as the inadmissibility of statements made by Vit to a mental health therapist because of irrelevancy and privilege; the relevance of the testimony of the victim's cousin about Vit's statement to the effect that, "he [Vit] would have killed [the victim] if he had not found the Lord"; and the refusal by the trial court to receive into evidence proper testimony by a neighbor of the victim that, during the course of these incidents, he gave Vit a ride home early in the morning, and Vit was in a good mood because he had spent the night with his girlfriend and thought he could patch things up. In argument, Vit broadens this claim of error to include a statement by Vit to another witness that he had suggested he might commit suicide before the September incident, and the testimony of his friend that he was contemplating killing himself and perhaps taking the life of the victim and her daughter.

As the State appropriately points out, the law in Wyoming is that evidentiary rulings are within the sound discretion of the trial court and will not be overturned on appeal without demonstration of a clear abuse of discretion. *Hodges v. State*, 904 P.2d 334 (Wyo.1995); *Curl v. State*, 898 P.2d 369 (Wyo.1995); *Guerra v. State*, 897 P.2d 447 (Wyo.1995); *Candelaria v. State*, 895 P.2d 434 (Wyo.1995); *Jackson v. State*, 891 P.2d 70 (Wyo.1995); *Herdt v. State*, 891 P.2d 793 (Wyo.1995); *Armstrong v. State*, 826 P.2d 1106 (Wyo.1992). In *Martinez v. State*, 611 P.2d 831, 838 (Wyo.1980), we noted no abuse of discretion can be found unless the

court conducts itself in a way that exceeds the bounds of reason. In *Martin v. State,* 720 P.2d 894, 897 (Wyo.1986), we defined judicial discretion in this way:

> Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen,* 41 Wash.App. 495, 704 P.2d 1236 (1985).

Vit has the burden of demonstrating an abuse of discretion. *Armstrong.* We also recognize that:

> Our consideration of the issue is premised upon our well-established rule that decisions of the trial court with respect to the admissibility of evidence are entitled to considerable deference and, as long as there exists a legitimate basis for the trial court's ruling, that ruling will not be reversed on appeal. *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).

*Tennant v. State,* 786 P.2d 339, 343 (Wyo. 1990).

The friend with whom Vit spent the night of December 26, after he had ripped out the victim's phone lines was concerned about what else he was capable of doing. The following morning, that friend was so concerned about the potential for violence that he discussed these matters with the police. As a result of Vit's dialogue with a police officer on December 27, 1993, Vit was taken to a counselor at the local mental health clinic. That counselor is a licensed mental health therapist. Vit was agitated during their interview and specifically said, among other things, "I may do something to [the victim] this time but this time I'm going to make them kill me."[1]

■ Before trial, Vit addressed the admissibility of testimony from the counselor in two separate motions *in limine.* In both motions, he raised the claim of privilege as found in Wyo.Stat. § 33–27–123 (Supp.1993), and in his first motion he also objected that this testimony lacked probative value, asserting, "[t]he crime of stalking has to do with the acts of surveilling [sic] or harassing, and confidential statements to counselors do not harass and do not result in surveillance." In addition, this issue was addressed in connection with a motion by the counselor to quash the subpoena that was served. In his brief, Vit argues the information was not communicated to the victim by him, and he was not aware it had been communicated by anyone else. For this reason, he contends the threats were not relevant to the stalking charge. In his second motion, he argued the exception found in Wyo.Stat. § 33–27–123(a)(iv) is inapplicable. The trial court ruled against Vit, concluding the testimony was relevant to identity and to the intent element of the crime. We are satisfied this evidence clearly was relevant.

■ As to the claim of privilege with respect to the communications to the counselor, that is governed by Wyo.Stat. § 33–27–123(a)(iv) (Supp.1993), which provides in pertinent part:

---

1. The mental health therapist testified by reading from the Emergency Contact Note of her session with Vit, which was the State's Exhibit 1:

   **Summary of Contact:** This therapist saw Mr. Vit as a CI referral from law enforcement. He was escorted here and transported by law enforcement. He was extremely adgitated [sic] due to recent no contact as court ordered by court on assault and battery involving his girlfriend [the victim]. He admits to violation recently of the no contact and threatens he will continue to violate it and may do bodily harm to [the victim]. He has a tendency to blame others for incidents which have occurred (loss of business—auto body,—loss of vehicle—loss of income—loss of companionship.)

   During the interview he threatened "I may do something to [the victim] this time but this time I'm going to make them kill me" (Them referred to as law-enforcement.) "Whatever I have to do I'll do" "Whatever is going to happen is going to happen" "I'm very angry and its probably going to blow" "I may shoot someone" "I don't care anymore." Michael ended the session by walking out of the room & building. He was extremely angry that there was not a quick fix.

   I immediately called law enforcement ([name of officer]) and reported the above statements. He said he would be calling the S.O. to notify them. At this time this therapist felt that he could be a threat to himself or others particularly [the victim].

   [Signature of therapist]

(a) In judicial proceedings, whether civil, criminal, or juvenile, in legislative and administrative proceedings, and in proceedings preliminary and ancillary thereto, a patient or client, or his guardian or personal representative, may refuse to disclose or prevent the disclosure of confidential information, including information contained in administrative records, communicated to a person licensed or otherwise authorized to practice under this act, or to persons reasonably believed by the patient or client to be so licensed, and their agents, for the purpose of diagnosis, evaluation or treatment of any mental or emotional condition or disorder. The psychologist or school psychologist shall not disclose any information communicated as described above in the absence of an express waiver of the privilege except in the following circumstances:

\* \* \* \* \* \*

(iv) Where an immediate threat of physical violence against a readily identifiable victim is disclosed to the psychologist or school psychologist \* \* \*.

Vit argues his communication was not appropriately disclosed because the counselor testified she left the determination of the nature of the threat up to law enforcement. It is clear, however, she was referring to the ability of law enforcement officers to obtain a temporary involuntary commitment if an individual poses a threat to himself or others. *See* Wyo.Stat. § 25–10–109 (1990). The fact that the therapist did not seek the involuntary commitment does not avoid statutory exception, which permits the disclosure under the circumstances. This disclosure was excepted from the confidentiality provisions of the statute. The notes made by the therapist are clear: "At this time this therapist felt that he could be a threat to himself or others particularly [the victim]."

■ In still another motion *in limine*, Vit attacked the testimony of the victim's cousin. He asserted:

The Defendant requests that this testimony be suppressed as it is not relevant. First of all it is not probative. The crime of stalking has to do with the acts of surveilling [sic] or harassing. Speculative statements about what might have happened at some past time do not harass and do not result in surveillance. On the other hand, the language is very prejudicial to the Defendant. Not probative and very prejudicial clearly results in the matter not being relevant.

The trial court ruled against Vit, and properly so, because the testimony of this witness was probative with respect to Vit's criminal intent and, to a degree, constitutes an admission by Vit of his culpability. Vit's other claims of error attributable to the admission of evidence that he had uttered threats to take his own life also are without merit.

■ We also conclude there was no abuse of discretion by the trial court in excluding certain evidence. Vit wanted to prove the victim's ex-husband had been released from prison about the time the victim broke off the relationship with Vit. The record is clear, however, that Vit was unable to establish an appropriate foundation for this evidence. In fact, an analysis of Vit's argument reveals that the defense perceived justification for Vit's conduct if he were in "anguish over another man," and that may have "been the source of his anguish and emotional outbursts, and not a desire to hurt the victim." This is simply motivation, not justification, and hardly demonstrates relevancy. It would simply be an effort to divert the jury from the issues in the case before it.

■ With respect to the effort to introduce Vit's statements to his neighbor that he had spent the night with the victim on Christmas of 1993, the State's objection ultimately was sustained on the basis that the prejudicial effect of Vit's claim he had slept with the victim the night before outweighed the probative value of such testimony. The witness already had noted Vit was in a good mood. Again, we see no abuse of discretion by the trial judge in making this ruling.

■ After the jury was selected, but before any evidence was produced, the other district judge in the Sixth Judicial District was called to preside at the trial because of the sudden death of the mother of the district judge to whom the case had been assigned initially. Vit did object to the substi-

tution, but no reasons were given. Vit does not articulate any prejudice attributable to the substitution, other than speculation that he might have received more favorable rulings on the introduction of evidence from the judge originally assigned. Relying upon WYO.R.CIV.P. 63, he argues the substitute judge failed to certify familiarity with the case before taking over the trial. The pertinent rule is WYO.R.CRIM.P. 25(a) (emphasis added):

(a) *During trial.*—If by reason of death, sickness or other disability, the judge before whom a jury trial has commenced is unable to proceed with the trial, **any other judge regularly sitting in or assigned to the court, upon certifying familiarity with the record of the trial, may proceed with and finish the trial.**

The trial judge stated on the record (emphasis added):

THE COURT: Okay. Ladies and gentlemen, my name is Terry O'Brien. I'm the other district judge in the district. You know Judge Price.

I think maybe you were told by the bailiffs, but Judge Price's mother died last night. And so he was until [sic] able to or he wanted to leave immediately to go to the funeral. She lived in Arizona.

And I was attending a meeting in Casper. I got down there about 8:15, just in time to get a call to come back.

**I've since visited with the attorneys, reviewed the file, and was briefed by Judge Price with respect to the case. So I'm ready to take over now.**

We have not discovered, nor have we been referred to, any prescribed form for making the certification required by WYO.R.CRIM.P. 25(a). We hold that the remarks by the substitute judge, while they could have been stated in a more formal manner or in a separate document, constitute an adequate certification under the rule. The requirement of the rule is one of familiarity, not one of form. We are satisfied this record discloses sufficient familiarity by the successor judge to proceed with the trial. Vit was not prejudiced by the substitution and, in the absence of prejudice, any possible error would be harmless.

In another claim of error, Vit contends the trial court erroneously ruled he could not poll each juror for an individual answer to questions asked of the panel. WYO.R.CRIM.P. 24(c) (emphasis added) governs the examination of jurors in a criminal case:

(c) *Examination of jurors.*—After the jury panel is qualified the attorneys or a *pro se* defendant, shall be entitled to conduct the examination of prospective jurors, **but such examination shall be under the supervision and control of the judge,** and the judge may conduct such further examination as the judge deems proper. The judge may assume the examination if counsel or a *pro se* defendant fail to follow this rule. If the judge assumes the examination, the judge may permit counsel or a *pro se* defendant to submit questions in writing. The examination shall be on the record.

(1) The only purpose of the examination is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict.

(2) The court shall not permit counsel or a *pro se* defendant to attempt to precondition prospective jurors to a particular result, comment on the personal lives and families of the parties or their attorneys, nor question jurors concerning the pleadings, the law, the meaning of words, or the comfort of jurors.

(3) **In voir dire examination counsel or a *pro se* defendant shall not:**

(A) **Ask questions of an individual juror that can be asked of the panel or a group of jurors collectively;**

(B) Ask questions answered in a juror questionnaire except to explain an answer;

(C) Repeat a question asked and answered;

(D) Instruct the jury on the law or argue the case;

(E) Ask a juror what the juror's verdict might be under any hypothetical circumstance.

In Wyoming, the purpose of voir dire is to seek to establish grounds for challenge for cause; assess any individual bias as to each member of the panel; and to arrive at a determination of the potential jurors' ability to decide a case fairly. *Herdt; Summers v. State,* 725 P.2d 1033 (Wyo.1986), *confirmed on reh'g,* 731 P.2d 558 (1987); *Gresham v. State,* 708 P.2d 49 (Wyo.1985); *Jahnke v. State,* 682 P.2d 991 (Wyo.1984); *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Lopez v. State,* 544 P.2d 855 (Wyo. 1976). It is clear from our cases that the process is one of jury selection, not jury indoctrination.

In accordance with the rule, voir dire is subject to the supervision and control of the trial judge. The rulings of the trial judge are given deference within the permissible bounds. The authority of the trial court is discretionary and "[t]he only inhibition regarding the discretion of the trial court is that it must be exercised subject to the essential demands of fairness." *Jahnke,* 682 P.2d at 999. Our examination of this record persuades us that there was no abuse of discretion by the trial court regarding voir dire. Even though, WYO.R.CRIM.P. 24(c) states, in pertinent part, "counsel shall not * * * [a]sk questions of an individual juror that can be asked of the panel or a group of jurors collectively," Vit complains of the trial court's rulings with respect to his effort to seek individual responses from jurors. He contends, when questions were asked that would call for an affirmative response, he did not discern all members of the jury had responded and, since he was not able to seek their individual responses, he was prevented from ascertaining bias or prejudice. Our examination of the record persuades us counsel was afforded ample opportunity to question the members of the jury panel, and no error occurred.

Vit is actually complaining of a ruling of the trial court in a pre-trial hearing. The pertinent comments and rulings were:

THE COURT: * * * but I want to make it clear that I want counsel to comply with Rule 24(c) and in particular the requirements that counsel shall not ask questions of an individual juror that can be asked of the panel or a group of jurors collectively. * * *

And the reason I want to reiterate that rule is that part of the letter that you wrote indicated that you had reviewed the rule, and some of the language in it indicated that you were going to individually ask each juror questions. * * *

[VIT'S COUNSEL]: Can I ask how the court would rule if we ask a question that applies to everyone, then go out and get each person's answer? We can do that?

THE COURT: If it's appropriate. * * *

It is clear from the record that, during voir dire, counsel was not prevented from questioning any individual juror in any instance. The claim of error based upon the announced intention of the court to enforce the rule with no subsequent prejudicial ruling borders on the specious.

Vit asserts cumulative error. Since we have been unable to discern any error in the proceedings, it is obvious accumulation has no stature in this case.

The Judgment Upon Jury Conviction and the Sentence entered in the trial court are affirmed.