2002 WY 136

Dennis WILLIAMS, Appellant (Defendant),

v.

The STATE of Wyoming, Appellee (Plaintiff).

No. 00–341.

Supreme Court of Wyoming.

Sept. 20, 2002.

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel, Representing Appellant. Argument by Ms. Domonkos.

Hoke MacMillan, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Robin Sessions Cooley, Senior Assistant Attorney General, Representing Appellee. Argument by Ms. Cooley.

Before HILL, C.J., and GOLDEN, LEHMAN *, KITE, and VOIGT, JJ.

GOLDEN, Justice.

[¶ 1] Appellant Dennis Williams appeals his convictions for aggravated assault and battery, felonious restraint, and blackmail, for which he received sentences to be served concurrently. He challenges the accuracy of jury instructions and contends that prosecutorial misconduct during voir dire and closing argument denied him a fair trial.

[¶ 2] We reverse his conviction for felonious restraint and remand that count for a new trial, but affirm the two other convictions.

## ISSUES

[¶ 3] Williams presents these issues for our review:

I. Whether the trial court erred when it allowed both parties to argue conflicting interpretations of the felonious restraint statute?

II. Whether prosecutorial misconduct occurred during voir dire and closing argu-

ments which was so outrageous it prejudiced Williams and denied him his right to a fair trial?

III. Whether the trial court erred when it instructed the jury that "the value of human life" includes quality of life, over defense counsel's objection?

The State presents this statement of the issues:

I. Whether it was plain error for the prosecutor to argue for a particular interpretation of the felonious restraint statute, and whether it was plain error for the trial court to allow the prosecutor and defense counsel to argue competing interpretations of the law to the jury?

II. Whether there was prosecutorial misconduct either during voir dire or during closing argument?

III. Whether the trial court correctly instructed the jury that the "value of human life" may include the quality of that life?

## FACTS

[¶ 4] Williams supervised a work crew for his employer, Gane Productions, in Gillette, Wyoming. Joshua Wenger began working for Gane as a laborer in early January of 2000. On January 17, 2000, Wenger was assigned to Williams' work crew. Throughout the day, Williams harassed Wenger with name-calling and practical jokes. Wenger was assigned to Williams' work crew the next day and worked until his company vehicle broke down. A company supervisor told Wenger to take lunch until the vehicle was repaired. During lunch, Williams accused Wenger of causing the vehicle breakdown and threatened Wenger. After lunch was finished, Wenger began walking back to the job site. Williams tackled him from behind and tied him up. Williams is six feet tall and weighed 250–260 pounds. Wenger was eighteen years old and weighed about 130 pounds. The tackle and fall fractured and dislocated Wenger's hip and injured his face and chest. He lay tied up for approximately fifteen to thirty minutes in intense pain before he was released.

* Chief Justice at time of oral argument

[¶ 5] After Wenger was untied, it took more time to convince Williams that he was seriously hurt and get Williams to seek help. Williams began driving Wenger to meet a company supervisor, and, on the way, concocted a story for Wenger and told Wenger that if Wenger told the truth then Williams would break his other leg. A supervisor took Wenger to the hospital, and later Wenger gave an account of his injury implicating Williams and others. On April 16, 2000, Williams was arrested and charged with kidnapping in violation of Wyo. Stat. Ann. § 6–2–201(a)(iii)(b)(i); felonious restraint in violation of Wyo. Stat. Ann. § 6–2–202(a)(i)(b); blackmail in violation of Wyo. Stat. Ann. § 6–2–402(a)(i)(b); and aggravated assault and battery in violation of Wyo. Stat. Ann. § 6–2–502(a)(i)(b). The kidnapping charge was later dismissed. Williams was tried before a jury on the remaining three counts and convicted on all. He was sentenced to two to four years for felonious restraint, three to six years for blackmail, and four to eight years for aggravated assault. The sentences are to be served concurrently. This appeal followed.

## DISCUSSION

*Elements of Felonious Restraint*

[¶ 6] Wyoming's felonious restraint statute provides:

(a) A person is guilty of felonious restraint if he knowingly:

(i) Restrains another unlawfully in circumstances exposing him to risk of serious bodily injury; or

(ii) Holds another in a condition of involuntary servitude.

(b) Felonious restraint is a felony punishable by imprisonment for not more than five (5) years.

Wyo. Stat. Ann. § 6–2–202 (LexisNexis 2001).

[¶ 7] The jury was instructed as follows: The elements of the crime of Felonious Restraint, as charged in Count I of this case, are:

1. On or about January 18, 2000.

2. In Campbell County, Wyoming.

3. The Defendant, Dennis Williams.

4. Knowingly restrained Joshua Wenger.

5. Under circumstances exposing Joshua Wenger to a risk of serious bodily injury.

[¶ 8] In his first issue, Williams contends that plain error occurred when the trial court permitted the State to argue that "knowingly" as used in the felonious restraint statute referred only to the restraint portion of the statute. Williams argues this is an incorrect statement of the law. Williams contends that the term "knowingly" refers also to the exposure to risk of serious bodily injury, and further contends that the prejudice caused by the State's misstatement of the law was compounded by the failure of the trial court to provide guidance to the jury. The State contends that, based on the plain language of the statute, this Court can conclude that no misstatement of the law occurred.

[¶ 9] Although the felonious restraint statute was first enacted in 1982, we have not previously interpreted it. In 1982, Wyoming enacted a comprehensive criminal code based upon the Model Penal Code, and the felonious restraint statute was enacted along with significant changes to the kidnapping statute. Theodore E. Lauer, *Goodbye 3–Card Monte: The Wyoming Criminal Code of 1982*, 19 Land & Water L.Rev. 107, 124–25 (1984). The statutory language adopts that of the Model Penal Code. *Id.* at 125. Commentary to the Model Penal Code distinguishes felonious restraint from misdemeanor false imprisonment by using the risk of physical injury as the decisive factor for imposing felony punishment. In contrast, its maximum penalty of five years is considerably less than that imposed by the kidnapping statute. Model Penal Code § 212.2 cmt. 1, at 239 (Proposed Official Draft 1962). The felonious restraint statute is violated when a risk of serious bodily injury occurs and the action causing that risk is an unlawful restraint. The term "serious bodily injury" is defined by Wyoming statute, Wyo. Stat. Ann. § 6–1–104(a)(x) (LexisNexis 2001), and the word "unlawfully" is said to carry its "usual meaning of conduct violative of any legal duty, whether penal or civil in origin." Model Penal Code, *supra*, cmt. 2, at 241.

[¶ 10]  The Commentary explains that the language requires proof that the accused acted knowingly, meaning he "must have been aware that he was restraining his victim, that the restraint was unlawful, and that it exposed the victim to physical danger." *Id.* at 242. It articulates this reasoning:

The tentative-draft version of the offense failed to make the knowledge requirement explicit.  Under the general culpability provisions of the Code, silence would have been construed to authorize conviction upon proof of recklessness as well as of knowledge.  Upon reconsideration, however, it became apparent that recklessness would be an inappropriate standard for this offense.  The conduct involved here would virtually always be purposeful or knowing with respect to the fact of restraint.  Moreover, the element of serious bodily injury is stated expressly in terms of risk.  This formulation reaches the actor who is reckless with respect to physical harm by punishing one who is aware of the risk thereof.  Finally, with respect to the unlawful character of the restraint, a knowledge requirement seems proper if only to guard against convicting peace officers of felonious restraint because of defects in their arresting authority.  For these reasons, Section 212.2 expressly requires a minimum culpability of knowledge with respect to each element of the offense.

*Id.* at 242–43.  As the commentaries demonstrate, the legislature intended that the State prove that the accused acted knowingly on each element of the offense.  *See Ellison v. State,* 3 P.3d 845, 849 (Wyo.2000).  Applying that interpretation to the instruction submitted, the jury was not properly instructed on the "knowingly" element.  Additionally, the term "unlawfully" was omitted.  The State acknowledges the omission but claims that the error was waived because no objection was made at trial and the error has not been raised on appeal.

[¶ 11]  "[I]nstructions to the jury are designed to inform the jury about the applicable law so that the jury may apply that law to its own findings with respect to the material facts."  *Brown v. State,* 817 P.2d 429, 439 (Wyo.1991).  "State and federal courts alike have long recognized that the failure to give any instruction on an essential element of a criminal offense is fundamental error, requiring reversal of the defendant's conviction."  *Vigil v. State,* 859 P.2d 659, 662 (Wyo.1993) (quoting *Cole v. Young,* 817 F.2d 412, 423 (7th Cir.1987)).  An instruction that neglects to include an essential element of the crime for which the defendant was convicted may be reviewed to determine whether the trial court committed plain error.  *Vigil,* 859 P.2d at 662.  The test whether the jury has been instructed on the necessary elements of the crime charged is whether the instruction leaves no doubt as to under what circumstances the crime can be found to have been committed.  *Miller v. State,* 904 P.2d 344, 348 (Wyo.1995).  "The accuracy of an instruction to the jury is purely a question of law which we review *de novo.*  If the instruction fails to correctly state the law, reversible error exists."  *Paugh v. State,* 9 P.3d 973, 975–76 (Wyo.2000).

[¶ 12]  Plain errors or defects that affect substantial rights may be noticed although they were not brought to the attention of the trial court.  Under our cases, in order to invoke the plain error doctrine, the following elements must be present: (1) the record must demonstrate clearly what occurred at trial without resort to speculation; (2) a clear and unequivocal rule of law must have been violated in an obvious way; and (3) this violation must have adversely affected some substantial right of the accused.  *Buckles v. State,* 830 P.2d 702, 707 (Wyo. 1992).  The inaccurate jury instruction in the record violates the clear and unequivocal rule of law that a defendant must be convicted upon proof beyond a reasonable doubt on all essential elements of the crime, and is necessarily prejudicial.  *See Vigil,* 859 P.2d at 663–64.

[¶ 13]  An additional ground for reversal exists because the law was misstated to the jury by the prosecutor during closing argument and by the trial court's rulings on objections to the defense's closing argument.  Reversible error exists when the misstatement adversely affected a substantial right of the defendant.

The right with which we are concerned is the fundamental right to a fair trial, free from tainted argument. A reversal and remand for a new trial—because of prosecutorial misconduct—will not be ordered as punishment for a prosecutor's misdeeds, but only because such misdeeds denied the accused a fair trial. Where a prosecutor repeatedly misstates the law to a jury, and thereby plants an erroneous conception which prejudices the defendant, a fair trial may, under certain circumstances, have been denied.

*Jones v. State*, 580 P.2d 1150, 1154 (Wyo. 1978) (citations omitted). Although *Jones* determined that the misstatement at issue in that case was isolated and could not have materially prejudiced the defendant, in this case the essence of the prosecutor's argument on this count was an incorrect interpretation of the term "knowingly," and the misstatement did materially prejudice Williams. Thus, the elements of plain error are established and require that we reverse Williams' conviction for felonious restraint.

*Elements of Aggravated Assault and Battery*

[¶ 14] The relevant portion of the aggravated assault and battery statute states:

(a) A person is guilty of aggravated assault and battery if he:

(i) Causes serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life[.]

Wyo. Stat. Ann. § 6–2–502(a) (LexisNexis 2001).

[¶ 15] The jury was given the following instructions on the charge of aggravated assault and battery:

Instruction No. 9

The elements of the crime of Aggravated Assault and Battery, as charged in Count III of this case, are:

1. On or about January 18, 2000.

2. In Campbell County, Wyoming.

3. The Defendant, Dennis Williams.

4. Recklessly caused serious bodily injury to Joshua Wenger.

5. Under circumstances manifesting extreme indifference to the value of human life.

Instruction No. 10

"Recklessly" is defined as the following conduct: A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

[¶ 16] During jury deliberations, the jury sent a note asking:

The jury is wondering if the phrase "extreme indifference to the value of human life" actually means that the defendant didn't care if the victim died or that he intended to have Josh Wenger die. Is the phrase dealing with the quality of Josh Wenger's life instead of living or dying?

The judge responded:

The State is not required to prove the defendant had an intent to kill to convict the defendant of aggravated assault and battery. The "value of human life" phrase is broad enough to include quality of life in addition to whether someone lives or dies.

Defense objected at trial to the second sentence of the response, arguing that it was confusing and misleading and has appealed on those same grounds.

[¶ 17] We recently addressed the meaning of the term "recklessly under circumstances manifesting extreme indifference to the value of human life." *O'Brien v. State*, 2002 WY 63, ¶ 16, 45 P.3d 225, ¶ 16 (Wyo. 2002). In *O'Brien*, the defendant, an older man, attacked a young victim and brutally beat him with his fists. The victim suffered severe injuries, and O'Brien was convicted of aggravated assault and battery. At trial, O'Brien's jury was instructed that it must determine, first, whether O'Brien acted intentionally, knowingly or recklessly, and then was required to determine whether that act was committed under circumstances manifesting extreme indifference to the value of

human life. *O'Brien* explained that the last term modified only the term "recklessly." Although *O'Brien* differs from this case because that jury was instructed on the additional elements of "intentionally and knowingly," we nevertheless find it appropriate to repeat our discussion of the meaning of the term "recklessly under circumstances manifesting extreme indifference to the value of human life."

[¶ 18] *O'Brien* decided that the term is intended to distinguish between reckless conduct that would justify only a battery conviction and a "special character of recklessness, or extreme recklessness." It concluded that, by delineating this special character of conduct, the statute was designed to more severely punish battery where the defendant's actions would have justified a murder conviction had his victim not fortuitously lived. *Id.* at ¶ 17. *O'Brien* quoted the commentaries of the Model Penal Code as advising that when recklessness is properly defined for the jury, the point involved is put adequately and succinctly by asking whether the recklessness rises to the level of "extreme indifference to the value of human life ... [because] it seems undesirable to suggest a more specific formulation." *Id.* at ¶ 21. In an aggravated assault and battery trial, the jury should be given an instruction defining "reckless under circumstances manifesting extreme indifference to the value of human life" rather than just "reckless." *Id.* "That definition will provide the statutory definition of reckless but must include language explaining that if the jury determines the defendant acted recklessly, the jury must then determine whether that recklessness rose to the level of 'extreme indifference to the value of human life.' " *Id.* In *O'Brien*, the more precise instruction was not given; however, the failure to do so was determined not to be error because the evidence supported the jury verdict under any of the three elements, "intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life." *Id.*

[¶ 19] *O'Brien* clarified that the statutory intent behind the language "intentionally, knowingly, or recklessly under circumstances manifesting extreme indifference to the value of human life" was to reach extremely reckless conduct that resulted in serious physical injury in the same manner as when the requisite state of mind resulted in serious physical injury. The jury in this case had only to consider the latter part of the statutory elements, extremely reckless conduct. Understandably, the jury requested further instruction on the meaning of this language, and the following would have been a suitable response to the jury's question:

The State must prove beyond a reasonable doubt that the defendant acted recklessly, under circumstances manifesting extreme indifference to the value of human life. Under our law, a person acts recklessly with respect to the results of his conduct if he consciously disregards a substantial risk and unjustifiable risk that the result will occur from his conduct. The risk must be of such a nature and degree that considering the nature and purpose of the actor's conduct and the circumstances known to the actor, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

One is said to act recklessly if one acts with recklessness, with scorn for the consequences, heedlessly, or foolhardy. The phrase, under circumstances manifesting extreme indifference to the value of human life, does not focus on the state of mind of the actor; but, rather, on the circumstances under which you find that he acted.

If in light of all the evidence, you find that the conduct of the defendant resulted in a probability as opposed to a mere possibility of serious bodily injury, then you may find that he acted under circumstances manifesting extreme indifference to the value of human life. In determining whether the defendant acted recklessly, under circumstances manifesting extreme indifference to the value of human life, you may consider the nature of the acts itself and the severity of any resulting injury.

*See State v. Pigueiras,* 344 N.J.Super. 297, 781 A.2d 1086, 1094 (A.D.2001).

[¶ 20] As can be seen, the given instruction was quite different from this explana-

tion; however, by confirming that intent to kill need not be proved and that the jury could consider the effect on "quality of life," the district court's instruction sufficiently indicated that the jury could consider "the nature of the act itself and the severity of any resulting injury." We affirm Williams' conviction for aggravated assault and battery.

*Prosecutorial Misconduct*

[¶ 21] In his final issue, Williams contends that a number of statements made by the prosecutor constitute prejudicial prosecutorial misconduct and warrant reversal. He alleges that the prosecutor engaged in improper preconditioning during voir dire, vouched for the credibility of witnesses, misstated the law, interjected personal beliefs, invoked the sympathy of the jury, and emphasized improper testimony. Prosecutorial misconduct "has always been condemned in this state." *Earll v. State,* 2001 WY 66, ¶ 9, 29 P.3d 787, ¶ 9 (Wyo.2001) (quoting *Valerio v. State,* 527 P.2d 154, 156 (Wyo.1974)). Whether such misconduct has been reviewed on the basis of harmless error, W.R.Cr.P. 52(a) and W.R.A.P. 9.04, or on the basis of plain error, W.R.Cr.P. 52(b) and W.R.A.P. 9.05, this Court has focused on whether such error affected the accused's "substantial rights." The accused's right to a fair trial is a substantial right. Wyo. Const. art. 1, §§ 6, 9, 10; and see *e.g., Jones v. State,* 580 P.2d 1150, 1154 (Wyo.1978). "Before we hold that an error has affected an accused's substantial right, thus requiring reversal of a conviction, we must conclude that, based on the entire record, a reasonable possibility exists that, in the absence of the error, the verdict might have been more favorable to the accused." *Earll,* ¶ 9.

*Voir Dire*

[¶ 22] During voir dire, without objection, a juror stated that a potential witness had performed surgery on his knee. The prosecutor asked that juror: "If he were to testify, you would probably believe what he said, wouldn't you." The prosecutor then asked, "just because the State is the person that calls Dr. Kioschos as a witness, you

wouldn't favor the State in making a decision as to whether or not Dennis Williams is guilty?" Williams contends that the State preconditioned the venire to think that the doctor had no reason to lie, and then preconditioned the venire by inflaming and misleading them with the following improper argument:

You know, when I was going through the jury questionnaires, there was, I believe, a lady that wrote on the back of one or a separate sheet of paper that she said she had a hearing problem and she said she would like to be excused and she couldn't live with herself because she couldn't hear and because she might have a misunderstanding of a question.

How about the other way around? I don't know who that lady is or if you are on the jury now, but can we turn that around. I know none of you would want to make a mistake or convict an innocent man. But if it was turned around, would you feel the same way if you were to turn a guilty man loose?

[¶ 23] W.R.Cr.P. 24(c) governs voir dire and states in pertinent part:

(1) The only purpose of the examination is to select a panel of jurors who will fairly and impartially hear the evidence and render a just verdict.

(2) The court shall not permit counsel or a *pro se* defendant to attempt to precondition prospective jurors to a particular result, comment on the personal lives and families of the parties or their attorneys, nor question jurors concerning the pleadings, the law, the meaning of words, or the comfort of jurors.

(3) In voir dire examination counsel or a *pro se* defendant shall not:

(A) Ask questions of an individual juror that can be asked of the panel or a group of jurors collectively;

(B) Ask questions answered in a juror questionnaire except to explain an answer;

(C) Repeat a question asked and answered;

(D) Instruct the jury on the law or argue the case; or

(E) Ask a juror what the juror's verdict might be under any hypothetical circumstance.

**Notwithstanding the restrictions set forth in subsections 24(c)(3)(A)-(E), counsel or a pro se party shall be permitted during voir dire examination to preview portions of the evidence from the case in a non-argumentative manner when a preview of the evidence would help prospective jurors better understand the context and reasons for certain lines of voir dire questioning.**

(emphasis added). In accordance with the rule, voir dire is subject to the supervision and control of the trial judge. *Vit v. State,* 909 P.2d 953, 960 (Wyo.1996). The rulings of the trial judge are given deference within the permissible bounds. *Id.* The authority of the trial court is discretionary and "[t]he only inhibition regarding the discretion of the trial court is that it must be exercised subject to the essential demands of fairness." *Id.*

[¶ 24] The State contends that, while the prosecutor's questions were inartful, the prosecutor was not attempting to precondition but was inquiring about potential biases and, therefore, did not violate the prohibitions of Rule 24(c). The prosecutor's questions, however, sought an improper commitment from the juror on the facts, and the second statement was misleading argument. While the rule permits a preview of the evidence, these kinds of questions remain objectionable because they do not produce information that would lead to a valid challenge for cause.

[¶ 25] Whether the prosecutor asked these questions intentionally in an attempt to improperly indoctrinate the jury and precondition its determination of the facts, or "inartfully," is irrelevant. Our concern is the effect of his words on the jury. Although the trial court has broad discretion, if the prosecutor's improper voir dire deprived the defendant of a fair trial, reversible error exists. The State contends that these two questions during a lengthy voir dire are not prejudicial. We recently reminded the State that we do not undertake a quantitative analysis as demonstrated by our reversal in a case where the jury panel was exposed to a single statement by a prospective juror that the accused was a horse thief. *Orona–Rangal v. State,* 2002 WY 134, ¶ 16 n. 3, 53 P.3d 1080 (Wyo.2002). We do agree with the State, however, that when this record is viewed in its entirety, the jury would have reached the same verdict had the improper voir dire not occurred.

*Closing Argument*

[¶ 26] Williams' contentions that closing argument was improper are based on the following statements:

The state has the burden to prove each of these elements, all five of them, beyond a reasonable doubt. That's our burden. It's a heavy burden, but it's one that we believe has been met and shown through the evidence.

Later, he said:

Did Josh Wenger all of a sudden dream up the crime of blackmail? No, I don't think so. I think Dennis Williams committed the crime of blackmail."

[¶ 27] The State contends this Court has decided that the terms "I believe" and "I think" are commonly used in casual conversation and the infrequent and inadvertent use of these phrases are not prejudicial. *Browder v. State,* 639 P.2d 889, 895 (Wyo. 1982); *Hodgins v. State,* 962 P.2d 153, 157 (Wyo.1998). In *Earll,* we said:

One of our concerns is what we generally know about a jury's view of a prosecutor. Jurors recognize the prosecutor's role as a leader of law enforcement in their community; they naturally regard the prosecutor as a symbol of authority; that recognition and regard may impress a jury, causing jurors to give significant weight to the words of a prosecutor.

*Earll,* ¶ 12. A prosecutor commits error when she injects her personal beliefs during closing argument. That error will be considered harmless when we judge that the jury's verdict would not have been different but for the prosecutorial misconduct. *Id.* at ¶ 9; *Warner v. State,* 2001 WY 67, 28 P.3d 21, 28 (Wyo.2001).

[¶ 28] In addition to these statements, Williams also challenges the following statements as improper vouching:

You know, the reason he doesn't know what to do with the blackmail is because there's nothing he can do with it except call Josh Wenger a liar. When he does that, he calls Mr. Wenger a liar, he says, well, I think they are all liars. I think Mr. Murray can speak for himself on that. I don't think he can speak for Mr. Wenger. Because look at Mr. Wenger's testimony. Was Mr. Wenger impeached by Mr. Murray? No. He held up rather well. He stuck to what was the truth. He stuck to his story. The reason it's easy to stick to a story like that is because you don't have to remember what you said when you tell the truth. And Mr. Wenger told the truth. And he came across that he was telling the truth when he sat up there, and his story was consistent whereas everybody else's was not consistent.

So Mr. Murray can speak for his own witnesses and his own client when he says that everybody up there was a liar. But I think he should accept Josh Wenger. I think he should accept Dale Muhlbauer. I think he should accept Dr. Kioschos. And I think he should accept Randy Humphrey.

\* \* \* \*

And I want you to ask why if Mr. Wenger only wanted this big worker's comp. money, which he didn't get very much, why is he here today subjecting himself to all this pain and trouble, why he kept up with the story, why he persisted so he could have all this fun and get Mr. Williams in trouble. No, he didn't do it because of that. The reason he did it is because he told the truth and so did his witnesses.

[¶ 29] Williams also claims that the following was an improper appeal to the sympathy of the jury because it asked the jury to place themselves in the victim's shoes: "Mr. Williams wouldn't let it go at that. He tapes him up. Can you imagine the pain of that?"

[¶ 30] Finally, Williams complains that, after defense counsel improperly caused the State's expert to invade the province of the jury by testifying that the dislocated hip injury met the definition of "serious bodily injury," the State improperly emphasized that testimony in closing argument. We will

agree with Williams that the prosecutor's statements were improper, but do not find them so prejudicial that a new trial is required. When reviewing improper prosecutorial arguments to determine whether it prejudiced the defendant during jury deliberations, among the factors to be considered are the nature and gravity of the error, the prosecutor's duty to do justice and refrain from improper methods, the likely impact on the average juror, the quality of the prosecution's case, and the closeness of the case. *Earll,* ¶ 16; *see also Mazurek v. State,* 10 P.3d 531, 539 (Wyo.2000) (nonexhaustive list of factors).

[¶ 31] The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own. Our review of the record shows that the prosecutor did not suggest that he was relying upon information outside the evidence presented at trial. Although it was improper for the prosecutor to express his personal opinion about respondent's guilt, when viewed in context, the prosecutor's remarks cannot be read as implying that the prosecutor had access to evidence outside the record.

[¶ 32] Under these circumstances, the substantial evidence of Williams' guilt provides an additional indication that the prosecutor's remarks, when reviewed in context, cannot be said to undermine the fairness of the trial. On this record, we hold that the argument of the prosecutor, although error, did not constitute plain error nor are we persuaded that the challenged argument seriously affected the fairness of the trial.

[¶ 33] The conviction for felonious restraint is reversed and remanded for new

trial. The convictions for blackmail and aggravated assault and battery are affirmed.