2004 WY 51

**Anita LAFOND, Appellant (Defendant),**

v.

**The STATE of Wyoming,
Appellee (Plaintiff).**

No. 03–25.

Supreme Court of Wyoming.

May 5, 2004.

Rehearing Denied May 25, 2004.

Representing Appellant: Mike Cornia, Evanston, WY. Argument by Mr. Cornia.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Theodore E. Lauer, Director, Prosecution Assistance Clinic; and Julie K. Jenkins, Student Intern. Argument by Ms. Jenkins.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] Anita Lafond (Lafond) appeals her conviction of one count of obtaining a controlled substance by fraud in violation of Wyo. Stat. Ann. § 35–7–1033(a)(iii) (Lexis-Nexis 2003).[1] Lafond argues she was denied her right to due process and a fair trial. Her argument focuses on various comments made by the prosecutor during the course of the trial that she claims were improper. Lafond

---

1. Wyo. Stat. Ann. § 35–7–1033(a)(iii) provides:
   (a) It is unlawful for any person knowingly or intentionally:

   (iii) To acquire or obtain possession of a controlled substance by misrepresentation, fraud, forgery, deception or subterfuge[.]

additionally asserts the court erred in not admitting the written statement of an alibi witness who was out of the country on active military duty and that the Wyoming constitution provides more protection for bank records than the federal constitution. We affirm.

### ISSUES

[¶ 2]   Lafond presents the following issues on appeal:

I.   Was the appellant denied her right to due process and a fair trial due to the prosecutors repeatedly telling the jury to do their duty and convict, expressing his opinion of appellant's guilt, by repeatedly telling the jury "she did it," telling the jury that appellant and her counsel were deserving of shame and forcing the appellant to call the credibility of the State's witnesses into question?

II.   Was it reversible error for the court to refuse the admission of the affidavit of the Appellant's alibi witness given that the witness was unavailable due to being called up to active military service and that the State chose to focus on the lack of an alibi witness?

III.   Will this court sanction and condone the unfettered access of the government into the bank records of the citizens of this state?

The State rephrases the issues as:

I.   Was Appellant denied due process and a fair trial by the prosecutor's remarks in opening statement or closing argument, or did the prosecutor personally attack defense counsel or improperly force appellant to assert that the State's witnesses were part of a "vast conspiracy"?

II.   Did the district court err in excluding from evidence the written statement of Appellant's witness who had been called into active military service?

III.   Did Appellant's right to privacy in her bank records preclude the State from obtaining those records by subpoena duces tecum?

### FACTS

[¶ 3]   In August 2001, Lafond worked as a supervising registered nurse at Cheyenne OB/GYN and was a captain in the Air National Guard. At Cheyenne OB/GYN, Lafond worked with a medical assistant named Erin Meyen. Ms. Meyen's son suffered from cerebral palsy and had recently undergone surgery. On August 7, 2001, Lafond allowed Ms. Meyen to borrow her car to take Ms. Meyen's son to the hospital in Denver due to a medical emergency. Because of her son's condition, when Ms. Meyen arrived at the hospital she parked in a handicapped zone even though she had no handicap permit. Ms. Meyen decided to write a note to explain the situation, asking that she not be towed. Looking for a piece of paper on which to write her note, Ms. Meyen checked the console of the car and found a folded piece of paper.

[¶ 4]   When Ms. Meyen unfolded the paper, she found that it was a prescription for Percocet made out to Lafond. The prescription looked to have Dr. Storey's signature, but the handwriting on the prescription was Lafond's. After viewing the prescription, Ms. Meyen continued her search for paper and found another piece of paper on which were several doctors' stamped signatures. Ms. Meyen did not take these papers from the car, and they were never introduced at trial.

[¶ 5]   Upon Ms. Meyen's return to Cheyenne, she said nothing to Lafond about what she had found. However, Ms. Meyen's curiosity was kindled, and she sought to find out whether or not Lafond had passed a prescription for Percocet at any of the pharmacies in Cheyenne by calling area pharmacies to ask about such prescriptions. She began with Walgreen's. The pharmacist at Walgreen's told Ms. Meyen that just a few days prior a prescription for Percocet had been filled for Lafond.

[¶ 6]   At that point, Ms. Meyen asked the pharmacist to fax her a copy of the prescription, and the doctors at Cheyenne OB/GYN were made aware of the situation. The prescription was dated August 5, 2001, and appeared to have the signature of Dr. Eskam. However, Dr. Eskam had never prescribed

Percocet for Lafond, the signature on the prescription was not hers, and she was not even working on the day that the prescription was supposedly prepared. After seeing the forged prescription, Dr. Eskam went to Walgreen's to view the store's videotape of the person passing the prescription. While Dr. Eskam could not absolutely identify Lafond from the video, she noted that if someone were impersonating Lafond they did a good job of imitating her. The matter was then referred to the state nursing board.

[¶ 7] At trial, the pharmacist who filled the prescription, Leah Scadden, testified. Ms. Scadden stated that on the morning of August 5, 2001, she was presented with and filled a prescription for Percocet made out to Lafond. Ms. Scadden recalled that the customer was dressed in a camouflage military uniform and paid for the $5 prescription by check, which Ms. Scadden saw the customer write out and take from a checkbook. This check bore the name and address of Lafond and was run through the register at 7:44 a.m. Ms. Scadden identified Lafond as the customer who presented the prescription and further related that, when she was presented with the prescription, the person said she was "Anita from OB/GYN" and that she talked to Ms. Scadden "all the time on the phone." Ms. Scadden testified that she talked to the woman for two or three minutes and that the woman had said that she was in the National Guard and was working that weekend. The woman's voice sounded the same as that of the woman from Cheyenne OB/GYN to whom Ms. Scadden had talked numerous times. In addition to her testimony about the events, Ms. Scadden authenticated the videotape of the purchase. The tape shows the person purchasing the Percocet entered the store at 7:39 a.m. and departed at 7:47 a.m.

[¶ 8] Detective Puente of the Cheyenne Police Department also testified. Detective Puente conducted the investigation of this matter after receiving a report from the state nursing board. During his investigation Detective Puente interviewed Lafond. He testified that Lafond stated she was missing some checks and that she had reported these missing checks to the bank. The check written to

Walgreen's on August 5 was not one of those Lafond reported missing. However, Lafond maintained that the $5 check to Walgreen's must have been forged. Detective Puente also testified that he had timed how long it took to get from the National Guard to Walgreen's and that it varied depending on the traffic lights; but the two times he had done it he timed it at 7 minutes and 34 seconds and 8 minutes and 14 seconds. The defense presented James Rasnake, a private investigator who had also timed the trip, to refute this testimony; and he testified that it would take 30 to 32 minutes round trip, though his estimate included walking into and out of Walgreen's and Lafond's Air Guard third-floor office.

[¶ 9] Robin Kreir from Lafond's bank also testified. She stated that the actual check written for the forged prescription, as well as the checks numerically close to that check, was destroyed. Microfilm copies of the checks were available, however, and these were admitted into evidence. Ms. Krier also testified that the bank had no record of a stop payment order on any of Lafond's checks, including the ones Lafond had told Detective Puente were stolen.

[¶ 10] Lafond denied being the person who purchased the Percocet. She claimed that she could not have made the purchase because she was at Guard training that day. Lafond called several witnesses to testify to her whereabouts between 7:00 and 8:00 a.m. on August 5. Lyle Orr testified that Lafond was at roll call at 7:00 a.m. and that roll call takes 5 to 20 minutes. He then saw her again at 7:30, and then again at an 8:00 a.m. "intel" meeting. Debra Mutter also testified that, while she could not specifically recall seeing Lafond on August 5, she would have remembered her not being at the commander's call at 7:30, which usually lasts 15 to 20 minutes. Renee Mulberry also testified that she recalled seeing Lafond at the base that Sunday morning. Linda Sergeant testified that, based on Guard records, Lafond was there that day. However, it appeared no one at trial could specifically account for Lafond's whereabouts between 7:30 and 8:00 a.m.

[¶ 11] Lafond testified on her own behalf. She testified that she felt she was set up and

essentially implicated Ms. Meyen. In explaining her theory, Lafond testified that the two had originally gotten along very well, however, problems developed between Ms. Meyen and Lafond. In detailing the reasons for the change in their relationship, Lafond testified Ms. Meyen claimed to be leaving for a medical appointment, but got her nails done. Lafond also testified that Ms. Meyen would leave work early on Fridays so she could drop her son off with his father in Glendo and be back in time for happy hour. Additionally, Lafond related that she had to discipline Ms. Meyen on several occasions for making inappropriate comments to patients and for holding herself out as a nurse.

[¶ 12] Lafond further testified that she was at the Guard on August 5 wearing her flight suit and boots, not her camouflage uniform, because she was scheduled to fly. She stated she went to roll call at 7:00 a.m. and then worked at her desk and talked to Julie Major–Funz until 7:30 a.m. when she went to commander's call. She then stated that she remained in the classroom until she went to an intel meeting at 8:00 a.m. Lafond denied she was the person on the videotape and stated that she did not remember having gone to Walgreen's on August 5, although she had been there the day before. She denied forging the signature on the prescription and writing the check to pay for it. She also denied that there had been prescription notes and doctors' signatures in her car.

[¶ 13] After deliberation, the jury returned a guilty verdict; and the district court entered judgment and sentence on October 23, 2002. Lafond was sentenced to a term of not less than two years nor more than four years in the custody of the Wyoming Department of Corrections. The sentence was suspended, and Lafond was placed on three years supervised probation. Lafond appeals that judgment and sentence.

### DISCUSSION

#### Prosecutorial Misconduct

[¶ 14] In her first claim of error, Lafond asserts she was denied a fair trial due to various inappropriate statements made by the prosecutors during the course of trial. At trial Lafond did not object to any of the prosecutors' statements that she now alleges were improper. We therefore apply our plain error standard of review. *Dysthe v. State*, 2003 WY 20, ¶ 23, 63 P.3d 875, ¶ 23 (Wyo.2003). "Plain error exists when 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right which materially prejudiced him." *Id.*

[¶ 15] When reviewing allegations of prosecutorial misconduct, we review the entire record to determine whether the improper comments so prejudiced the defendant's case that they resulted in the denial of a fair trial. *Wilks v. State*, 2002 WY 100, ¶ 26, 49 P.3d 975, ¶ 26 (Wyo.2002); *Burton v. State*, 2002 WY 71, ¶ 11, 46 P.3d 309, ¶ 11 (Wyo.2002). Additionally, we judge the challenged comments not in isolation but in the context of the prosecutor's entire argument, considering the context of the comments and comparing them with the evidence produced at trial. *Wilks*, ¶ 26; *Helm v. State*, 1 P.3d 635, 639 (Wyo.2000). Reversal is not warranted unless a reasonable probability exists, absent the error, that the appellant may have enjoyed a more favorable verdict. *Dysthe*, ¶ 22; *Mazurek v. State*, 10 P.3d 531, 542 (Wyo.2000).

[¶ 16] Lafond makes her claims of prosecutorial misconduct in four distinct areas. We note that all the comments Lafond asserts as improper are clearly set forth in the record. As such, the first requirement of our plain error standard is met. Our focus in all Lafond's claims of misconduct will therefore be the second and third elements of plain error.

[¶ 17] Lafond's first claim of misconduct is that the prosecution repeatedly exhorted the jury to "do their duty" and convict her. The first instance to which Lafond points occurred at the end of opening argument. However, as noted above, we review the prosecutor's comments in the context in which they were made. We, therefore, must consider not only the specific comments Lafond claims show error but also the context surrounding those comments. In doing so it

becomes necessary to set out a portion of the proceedings. This will add to the length of the opinion, but we feel it is important to show the atmosphere in which the statements were made. In order to get the full context of the statements Lafond emphasizes in this area, we must begin with comments made before opening statements in voir dire.

[¶ 18] The prosecutor began his voir dire by asking the potential jurors several questions about holding people accountable.[2] The prosecutor then questioned the jurors about whether they would want the prosecution to prove why Lafond would do that with which she was charged. Several potential jurors indicated that they would be curious about why. The prosecutor then stated:

> And that's a natural thing, isn't it? That's a fair and natural thing, but folks, it's not one of the five things the State has to prove. It's not why she did it, isn't something we got to prove. Is anybody going to make me prove—we want to know why, but maybe we never will. Maybe we won't. . . .
>
> . . .
>
> Is anybody going to make us prove it, no? Doesn't everybody agree, if we prove the five elements, that's all we have to prove? Does everybody agree with that?

[¶ 19] In his voir dire, defense counsel questioned the potential jurors along somewhat similar lines.

> Now, [the prosecutor] talked to you about if a person comes in here, being a good person, if they commit a crime, we have to hold them accountable. Does everyone agree that in a case where you're deciding whether or not a person committed a crime, that their background would be important to you, their character?
>
> . . .
>
> [The prosecutor] talked about the State not having to prove why a crime was committed, and I'm going to talk to you a bit about that, and it's true they do not have to prove why a crime was committed. Let me ask you this: In the general sense of

your familiarity with crimes that are committed, usually think there's a reason behind it? . . .

> . . .
>
> In deciding a case, as [the prosecutor] stated, they don't have to prove a motive or why, but do you think it's important if you are trying to decide if a person committed a crime to know whether or not why they were doing it; is that important to anyone?

[¶ 20] It was against this background that the trial then progressed to opening statements, and we find the first statement to which Lafond objects. The prosecutor stated:

> Folks, that will be the State's evidence in this case. The State intends to prove each and every element of this case against Anita Lafond beyond a reasonable doubt. At the conclusion of this case, we will have another opportunity to visit with you and speak with you. At that time, we will ask you to do your duty. We will ask you to hold this defendant accountable, and we're going to ask you to find her guilty of prescription fraud.

[¶ 21] Following the prosecutor's opening statement, defense counsel presented his opening statement. Defense counsel stated:

> There's a reason behind every crime that's committed. No matter if it's a ridiculous reason, if it's a reason motivated out of anger, out of hatred, one for money, one for drug abuse, whatever it is, there is always a reason why someone commits a crime no matter how ridiculous it may be. There is always a reason, and in this case, there was a crime committed. There's no question about that, but Anita Lafond did not commit the crime.
>
> . . . You'll see that she has absolutely no reason whatsoever to have gone into Walgreen's to purchase 30 pills, $5 worth of Percocet, absolutely none.
>
> She has never had a drug addiction problem. She's never abused or used any type of drug, for that matter; has never

---

**2.** Two attorneys from the prosecutor's office took part in the prosecution of this case. Lafond's arguments encompass comments made by both attorneys. For simplicity sake, we will not distinguish between the two attorneys and will simply refer to them collectively as the prosecutor.

had anything in her background to indicate that she would commit a crime of this nature. There's absolutely nothing there. In fact, you will see that it would be tantamount to professional suicide for her to want and try to commit this crime.

[¶ 22] At trial, in addition to the evidence about the incident itself, evidence relating to Lafond's character and the possible reasons or lack thereof for committing such a crime was presented. Dr. Eskam testified that she had known Lafond for some time, that she could not believe that Lafond would do this, that Lafond was "one of the best people" that had ever worked there, and that Lafond was a "wonderful person." Ms. Meyen testified that Lafond was the kind of person who, out of the goodness of her heart, allowed a friend to take her car to Denver and was the kind of person that would give you the shirt off her back. She also testified that she knew of no reason why Lafond would need Percocet. Ms. Mulberry testified that Lafond was "a wonderful person," very honest and truthworthy, a very kind-hearted person with no drug addiction problems. Linda Sergeant testified that Lafond had integrity, "the biggest heart," and was an honest person with no drug problems. Ms. Flores, her current employer, testified that Lafond was loyal and trustworthy with no drug addiction. Negative drug tests taken by Lafond were also admitted, as were Lafond's National Guard performance reports which detailed some of her volunteer and charity work. Lafond testified that both her military and nursing careers would end with a felony conviction. She additionally noted that she would lose her military retirement benefits.

[¶ 23] Following the evidence portion of the trial, the attorneys presented closing arguments. The prosecutor's closing argument contains the second statement Lafond claims is error. Again we will provide additional comments for context.

The final thing you heard in this case from the defense witnesses, Anita Lafond is a good person. I'm not going to stand here and tell you that Anita Lafond is a bad person. That's not what we're here to establish. We're not here to establish that. That's not the issue in this case.

. . .

Last thing I'd like to talk to you about is some of the instructions Judge Grant gave to you. The State has the burden of proof in this case. We accept that burden of proof. It is our burden, but it's important for you to understand what our burden is, and what our burden is not.

. . .

And finally, what is it that we have to prove beyond a reasonable doubt? Judge Grant told you about that we have to prove the elements, and we talked about that in voir dire, as well. There's five elements in this case.

On or about the 5th day of August in Laramie County, Wyoming, the defendant, Anita Lafond, acquired or obtained possession of a controlled substance, Percocet or Roxicet by misrepresentation, fraud, forgery, or deception. Those five things. Those five things.

If the State proves to you those five elements, then by law by the oath you took in this case the verdict you have to return is a verdict of guilty. We talked about this in voir dire, as well. We're not required to prove why she did it. We're not required to prove why she did it. We don't even have to prove that she actually forged a prescription.

. . .

Clearly, all of those elements have been proven to you beyond a reasonable doubt. The evidence in this case is overwhelming.

Now, you've heard from the defense and boil away their argument down to a nutshell, it's essentially this: "Yeah, yeah, the State has presented a lot of evidence, overwhelming evidence, but you know what, Anita Lafond's a good person. Anita Lafond's a good person. This is going to impact her tremendously, look the other way, look the other way. Find a reason to find her not guilty."

That's the defense in this case. Find a reason, look the other way. You know, folks, you have the ability if you want to do that. You have the ability if you want to do that. You can always go back into the courtroom and say, "Well, yeah, we've got

this evidence of guilt over here, and it's overwhelming. It's a mountain of evidence, but you know, we got to really like to have this or that, so you know what, that's a reasonable doubt. She's a nice person."

Folks, that wouldn't be the right thing to do, and that would be to violate the oath that you took at the start of this case.

I would leave you with this final thought. I think you find yourself today in much the same situation that Erin Meyen found herself on August the 7th. You find yourself being confronted with overwhelming evidence that somebody who's otherwise a good person committed a crime, tremendous lapse of judgment, tremendous lapse of judgment, and now you've got to decide what you're going to do about it.

Remember, Erin Meyen said she went back to her office, she talked to the other nurses about what should she do, and one of the other nurses said, "Forget it. Look the other way. Don't get involved. Look the other way," but Erin Meyen knew that that wasn't the right thing to do. She knew that Anita Lafond's a nurse, she could hurt herself, she could hurt somebody else in her position.

Folks, you know that that's not the right thing to do, either. I don't envy you, your job. I don't envy it at all; I don't. I hope none of you thought when you walked into this courtroom on Monday that your job was going to be easy, as if you thought that then, you know better now; it's not. It's not easy.

It's like it is in this; doing the right thing very often is a hard thing to do. It's always easy to look the other way. Don't do that.

On behalf of the State, I would ask in this case that you do the right thing. I would ask that you follow the oath you took as jurors. I would ask that you do your duty, and I would ask that you find Anita Lafond guilty and hold her accountable.

[¶ 24] As can be seen by the above excerpts, the prosecutor did in fact ask the jury to do its duty. In *Hart v. State*, 2003 WY 12, ¶ 14, 62 P.3d 566, ¶ 14 (Wyo.2003) (quoting *Wilks*, ¶ 28), we said:

"Generally, an exhortation to the jury to 'do the right thing,' to 'do your job' or to 'do your duty' is error if it 'implies that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law.'" *Jackson v. State*, 791 So.2d 979, 1029 (Ala.Crim.App.2000), *cert. denied*, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001) (quoting *Arthur v. State*, 575 So.2d 1165, 1185 (Ala.Crim.App. 1990)). Such a statement may also run afoul of the admonition against injecting issues broader than the guilt or innocence of the accused. See [I A.B.A] Standards for Criminal Justice 3–5.8(d) [2d ed.1980].

[¶ 25] Additionally, "[i]t is . . . improper for the prosecutor to state that the duty of the jury is to find the defendant guilty." *Dysthe*, ¶ 27 (quoting *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir.1999)). Although the prosecutor did ask the jury to "do its duty," the context of the statements as shown by the excerpts above convinces us that in this case the prosecutor was not asking the jurors to convict without considering the evidence or implying that the jury could only do its duty through a guilty verdict. We reach this conclusion for several reasons.

[¶ 26] Specifically, before the prosecutor's comments in his opening statement, the prosecutor spent a great deal of the time outlining the evidence he intended to present and clearly acknowledged that the State carried the burden of proof in this matter. In context, we find the prosecutor's argument not unlike those found in *Hart*, ¶ 13. In *Hart*, the prosecutor stated, "I trust that you'll follow your oath and return a finding of guilty." *Id.* In that case we found that the prosecutor did not expressly tell the jury that, in order to perform its duty, it must return a guilty verdict. After reviewing the entire closing argument, we found that the prosecutor likewise did not make such an implication. *Hart*, ¶ 15. In context it is clear that the prosecutor was not expressly telling or implying to the jury that fulfillment of its duty could be achieved only through a

conviction. The prosecutor prefaced his comments regarding the jury's "duty" with his recognition of his burden and the statement of his intent to meet that burden. The prosecutor did not ask the jury to disregard that burden, but referenced the facts and essentially asked the jury to apply the evidence to the law. *See Wilks,* ¶ 28.

[¶ 27] The prosecutor's comments are of a similar vein in closing argument. There the prosecutor set forth the five elements the State needed to prove and then said, "If the State proves to you those five elements, then by law by the oath you took in this case the verdict you have to return is a verdict of guilty." It was shortly after these comments that the prosecutor made the "duty" statements. Once again, taken in context, the prosecutor did not ask the jury to convict without weighing the evidence. The comments show that the duty to convict was contingent on the State proving the five elements he just outlined. In context, the prosecutor's statements seem not to be aimed at asking the jury to disregard the evidence but rather to dispel the notion that the prosecutor had to prove why Lafond would have done that with which she was charged. Indeed, the prosecutor's remarks appear to be an attempt to remind the jurors that "why" was not an additional element of the charged crime in light of the evidence introduced at trial. Thus, in this case, we cannot say that the comments transgressed a clear and unequivocal rule of law.

[¶ 28] Furthermore, while the propriety of a prosecutor's actions is not dependent on the actions of defense counsel, the prosecutor's reminder seems less objectionable in the context of defense counsel's comments in closing argument. Defense counsel started by saying:

This case comes down to two questions. I ask you to consider these two questions before you decide to convict Miss Lafond. If anyone tries to get out of the courtroom—out of the deliberation room without answering these questions, I ask you to stop them and say, "Tell me"—to explain these two questions, why and how? That's it. Why and how? Why on earth would this person, Anita Lafond, do this? Why

would she, a nurse 10 years, educated, head nurse, supervisory role, in the military 20 years, benefits for those 20 years, husband, wife, mother, not addicted to Percocet, not addicted to any type of drug. Why? Why on earth would she do this?

I didn't hear [the prosecutor] address that issue once in his closing argument, and you know why, because that is the most compelling question in this case, why would she do it. Remember we talked about that in voir dire. Every case there is a reason why a crime is committed. No matter how stupid, no matter how ridiculous, no matter what it is, there is a reason behind it. You can see it. Money, addiction, drug abuse, substance abuse.

. . . .

Again, ask yourselves, make yourselves answer that question. If you cannot answer that question, you cannot convict her—although the State doesn't have to prove motive to prove that she did it; to prove that she was the person who did it. You have to answer that question because why on earth would someone do something like that?

. . .

[The prosecutor] said, "Do the right thing," and I agree. Do the right thing, ladies and gentlemen. Let Miss Lafond go home, let her continue in helping people as she does on a daily basis, and as she has done with her entire life. Let her go home. It is your decision.

[¶ 29] As can be seen, in addition to focusing on "why," defense counsel specifically addressed the prosecutor's comments. Each party had a different take on what "the right thing" or the jury's "duty" was. We have stated several times that we do not approve of the prosecutor's use of these types of "do your duty" statements. Indeed we find their continued use problematic. *See Hart,* ¶ 15, and *Dysthe,* ¶ 27. However, we cannot say that, when taken in context of this entire trial, the statements implied that the jury could only do their duty or the right thing by convicting. Because both sides made these types of statements, they were likely to be recognized by the jury as nothing more than each side attempting to persuade the jury to

view the evidence its way. Certainly defense counsel's own use of similar phrasing aided in dispelling the idea that the "right thing" could only be done through conviction. The statements were made in the context of what had previously been alluded to and argued by the parties. Accordingly, as noted above, the comments did not transgress a clear and unequivocal rule of law and consequently do not meet the second requirement of plain error.

[¶ 30] We cannot leave this topic without once again pointing out that we continue to review these "do your duty" comments with a careful and, where appropriate, jaundiced eye. *Hart*, ¶ 15. We have noted, "prosecutors would do well to avoid the tightrope between non-prejudicial and reversible error. The ethical duty of the prosecutor is an extraordinary obligation which exceeds that imposed upon the defense counsel." *Montoya v. State*, 971 P.2d 134, 137 (Wyo. 1998); Joseph F. Lawless, Jr., *Prosecutorial Misconduct*, § 9.09 (1985). In the face of our repeated warnings about the use of these types of statements, our patience with their repeated use grows increasingly thin. " 'Prosecutors must always keep in mind that their duty is to seek justice, not merely to convict, which is most certainly a difficult duty to be carried out carefully and cautiously.' *Jeschke v. State*, 642 P.2d 1298, 1303 (Wyo.1982)." *Montoya*, at 137.

[¶ 31] In, *Dysthe*, ¶ 25, we stated:

Because the goal of the criminal justice system is the attainment of justice, the role of the prosecuting attorney differs from that of an advocate in a civil case. The prosecutor's special role has been described in *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935):

The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

[¶ 32] We continue to stand by these statements. There are limits on prosecutors' closing arguments. These limits are designed to insure the fairness of the trial and prevent compromise of the judicial system. *Dysthe*, ¶ 24. We would once again encourage prosecutors to note our recently adopted broad guidelines found in I *A.B.A., Standards for Criminal Justice* 3–5.8 at 3.87 to 3.88 (2d ed.1980):

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.

*Wilks*, ¶ 27.

[¶ 33] Lafond's second claim of misconduct is that the prosecutor repeatedly expressed his opinion that Lafond "did it," and she points to specific excerpts from closing argument. However, we will once again provide more than just the phrases to which Lafond points, as we must consider "the prosecutor's argument in its entirety, not just the sentences and phrases taken out of

context. *Wheeler v. State*, 691 P.2d 599 (Wyo.1984)." *Armstrong v. State*, 826 P.2d 1106, 1115 (Wyo.1992). During the prosecutor's closing argument he stated:

> We know very significantly that the check that is used to pay for the Percocet on August 5th, that that check is drawn on the account of Anita Lafond, and it is signed by Anita Lafond.
>
> . . .
>
> Folks, it's that defendant that's on that video. No question about it. If it's not her, it's got to be her evil twin sister because it looks exactly like her.

[¶ 34] Lafond also points to the prosecutor's comments made in rebuttal.

> People do things that make no sense. Good people commit crimes for no reason. Did Miss Lafond? Yes. Yes, she did. Why did she do it? Folks, I don't know why she did it.
>
> [Defense counsel] wants you to believe we have to prove that beyond a reasonable doubt, but we don't. I challenge you to look at the elements. I challenge you to look at the elements, and say, "Oh, that's what the State had to prove. Why." We don't have to prove that. Maybe—maybe the grief from her child passing away had gotten to her. I don't know. Maybe the Prozac she was taking wasn't working enough. I don't know. Maybe she was feeling internal pain from the stresses and pressures of her life. I don't know. I don't know.
>
> Did she do it? Yes. Does it make any sense for her to do it? Well, no, but folks, neither does anything else she did in this case make any sense. Nothing she did made sense. . . .
>
> . . .
>
> Erin says she saw it in there. Do you believe her testimony? Do you believe her? That's for you to decide. Do you believe her? It's for you to decide whether or not you believe Anita Lafond when she testified.
>
> . . .
>
> [Defense counsel] says, "Well, the video doesn't prove conclusively 100 percent that it's Anita Lafond walking into Walgreen's."

> Well, no, folks, it doesn't. Leah Scadden says 100 percent, "It was Anita Lafond who walked into Walgreen's on August 5th and who gave me the prescription." Leah Scadden says it was, and she tells you how she knows her, and she tells you about the conversation the following day, which verifies it was her, and [defense counsel] wants to make a big deal of who has motive to lie. No question who's got motive to lie.
>
> There's no question as we sit here who has the motive to lie. It's not Leah Scadden; it's Anita Lafond. Good people when they commit a crime have a lot to lose; not by the criminal justice system, but perhaps by what they've acquired in their lives, nursing license, captain status in the Air National Guard, retirement benefits. They want to make you feel guilty.
>
> Well, you know she's going to lose all that if you find her guilty. You folks didn't walk into Walgreen's on August 5th. Wasn't you who did that. Though decisions have to be made every day. You folks did not walk into Walgreen's and pass a forged prescription. For whatever reason, on August 5th, you did not do it; she did it. Anita Lafond did it.
>
> . . .
>
> Nothing she did in this case makes any sense, and there are lots and lots of senseless crimes. I differ from [defense counsel]. People do things, you have no idea why they did them. You walk into court, and you get a case, and you look at it, and you go, "Why in the heck would someone do something like this?"
>
> . . .
>
> Good people do bad things, and when they do, they must he held accountable for them. Our justice system isn't just to try people who have committed other crimes, isn't just to try people who have—I don't know—Hispanic surnames, to try people who you can look at, and they have tattoos and mustaches, and their mama wouldn't even come and say they're a good kid. If that's all it's for, then it falls apart. If we don't hold accountable everybody, then it falls apart.
>
> Pledge of Allegiance has been in the newspapers lately. Some judge in Califor-

nia says, "Well, you can't say the Pledge of Allegiance in a classroom." Folks, I said the Pledge of Allegiance when I was a kid, and the last line of the Pledge of Allegiance, I believe in it says, "liberty and justice for all," and justice for all; not just the poor defendant, but every defendant who walks into this—defendant must be held accountable.

The evidence in this case is overwhelming. It is a mountain. There is no question. There is no question but that Anita Lafond did what she is charged with, and I ask you to find her guilty of the crime of prescription fraud. Thank you.

[¶ 35] "We are reluctant to find plain error in closing arguments 'lest the trial court becomes required to control argument because opposing counsel does not object.'" *Helm v. State*, 1 P.3d at 639 (quoting *Montoya v. State*, 971 P.2d at 136). However, " 'it is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence of the guilt of the defendant.' ABA Standards for Criminal Justice, The Prosecution Function, Standard 3–5.8 (1980)." *Mazurek*, 10 P.3d at 542. Both prosecutors and attorneys, acting as counsel, are prohibited from attesting to facts or asserting as fact their personal beliefs relating to matters in issue. *Id.* The attorneys in a case are not to be witnesses testifying through their closing. *Id.*

[¶ 36] Additionally, "[c]losing arguments must be based upon the evidence submitted to the jury. The purpose of closing argument is to allow counsel to offer ways of viewing the significance of the evidence." *Dysthe*, ¶ 24 (citing *Hopkinson v. State*, 632 P.2d 79, 145 (Wyo.1981)). Prosecutors, just like defense counsel, may review the evidence and suggest to the jury inferences based thereon. *Dysthe*, ¶ 24. However, we have noted our concern for what we generally know about a jury's view of a prosecutor. Specifically, "[j]urors recognize the prosecutor's role as a leader of law enforcement in their community; they naturally regard the prosecutor as a symbol of authority; that recognition and regard may impress a jury, causing jurors to give significant weight

to the words of a prosecutor." *Williams v. State*, 2002 WY 136, ¶ 27, 54 P.3d 248, ¶ 27 (Wyo.2002) (quoting *Earll v. State*, 2001 WY 66, ¶ 12, 29 P.3d 787, ¶ 12 (Wyo.2001)).

[¶ 37] In *Williams*, we observed that the prosecutor's expressing his personal opinion concerning the guilt of the accused posed two dangers:

[S]uch comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the government and may induce the jury to trust the government's judgment rather than its own.

*Williams*, ¶ 31. Therefore we must review the prosecutor's comments with a careful eye.

[¶ 38] In the context of this case, it appears the prosecutor's comments were not made to imply that he was relying upon information outside the evidence presented at trial. The prosecutor's comments likewise appear not to be a statement of the prosecutor's personal beliefs but instead suggested findings of fact and conclusions that could be drawn from those facts. The prosecutor's statements in rebuttal clearly relate and tie into defense counsel's closing arguments regarding Lafond's character and motive. Additionally, we find that the prosecutor's statements did not have the tendency to mislead because the comments were related to the evidence presented at trial not the implication of other evidence. *See Williams*, ¶ 31. The prosecutor's comments are an offer of a way to view the significance of the evidence, not a call for the jury to believe his own special insight to the facts. *Dysthe*, ¶ 24. We, therefore, cannot find that the prosecutor transgressed a clear and unequivocal rule of law.

[¶ 39] Lafond's third claim of misconduct is that the prosecutor personally attacked defense counsel and stated that Lafond and defense counsel were deserving of shame. "A prosecutor may not launch per-

sonal attacks against defense counsel to inflame the passions and prejudices of the jury." *Burton v. State*, ¶ 31. Additionally, "[i]t is firmly established that the lawyer should abstain from any allusion to the personal peculiarities and idiosyncrasies of opposing counsel." *Leiker v. State*, 994 P.2d 917, 920 (Wyo.1999) (quoting *United States v. Young*, 470 U.S. 1, 10, 105 S.Ct. 1038, 1043, 84 L.Ed.2d 1 (1985) and ABA Standards for Criminal Justice 4–7.8 at 4.97).

[¶ 40] As set forth above, one of the witnesses for the State was Ms. Meyen who testified to finding a forged prescription and a paper with various doctors' signatures on it. Evidence was also presented concerning Lafond's relationship with Ms. Meyen, including Lafond's statement that Ms. Meyen left work early sometimes because she wanted to get to happy hour. In closing argument the prosecutor commented:

> What does she [Erin Meyen] get for doing the right thing? She gets the opportunity to sit on that witness stand and be basically attacked and vilified by the defense. She's a lush. She's somebody who went to get her nails done at work.

> Shame on them. Shame on the defense for their laugh at her name. She did the right thing.

[¶ 41] Although we find these comments overdramatic and unnecessary, we do not think that, in context, they can be classified as a personal attack on the defense used to inflame the passions and prejudice of the jury. On cross-examination, defense counsel questioned Ms. Meyen rather pointedly about her relationship with Lafond and why she felt compelled to report what she found, as well as how she was able to call the exact pharmacy where the prescription was passed. The implication from defense counsel's questioning was Ms. Meyen was involved in some sort of set up.

[¶ 42] Additionally, a portion of Lafond's cross-examination contains the following exchange.

Q. Now, I mean, Erin's not a drunk, right?

A. Not that I know of. I know she goes out a lot.

Q. And she's not a totally irresponsible person who's going off work to get her hair and nails done, just totally irresponsible?

A. Yes, she is.

Q. Lush, drunk?

A. I didn't say she was a drunk. Yes, she was going off work to get her nails done, get her hair permed, yes.

As shown above, Lafond's comments regarding Meyen were relatively minor. The prosecutor's comments appear to be made to counter the idea that Ms. Meyen was irresponsible and a drunk. They were the only of their kind and appear in isolation. As such we do not think that the jury thought much of this argument other than it was an overly dramatic attempt to counter Lafond's "set-up" defense. Considering the context of the statement, we again cannot find them to be transgression of a clear and unequivocal principle of law.

[¶ 43] Lafond's fourth and final argument regarding the prosecutor's conduct is that the prosecutor forced Lafond to call the credibility of the State's witnesses into question by essentially forcing her to allege that the State's witnesses were all part of some vast conspiracy. It is improper to ask if the other witnesses are lying. *Taylor v. State*, 2001 WY 13, ¶¶ 20–21, 17 P.3d 715, ¶¶ 20–21 (Wyo.2001). The questioning Lafond points to proceeded as follows:

Q. So you feel strongly that whoever did this, Erin Meyen is involved in it?

A. I believe so. She's the only one that has seen the original prescription that was supposedly in my car.

Q. So we have Erin Meyen that might be involved in it, right? And we know because it's not Erin on that video that there's someone else involved in it, right? Leah Scadden testified and she said it was you?

A. She didn't ask for any photo identification. I didn't see Leah Scadden before that. I mean, I wouldn't be able to, after not seeing her in court.

Q. She didn't say, "I think"?

A. But she also didn't say anything about my name tag before, because I asked those questions.

Q. She didn't say, "I think." She didn't say, "Maybe." She said it was you on that?

A. She didn't say that a year ago.

Q. Is Leah Scadden now involved in this conspiracy?

A. I have no idea.

[¶ 44] When looking at the questioning, we find that the prosecutor was not forcing Lafond to comment on the credibility of the witnesses but instead questioning Lafond about the defense she had put forth at trial. The prosecutor is well within his right to question the rationality and viability of the defense. Lafond's defense was that somebody had framed her. She testified that someone went into that store and purchased Percocet pills under a fraudulent prescription, but she was not that person. Therefore the questions were reasonably related to the subject matter of the direct examination and were not intended as an improper search for opinion testimony. The questions were not aimed at an evaluation of the credibility of the State's witnesses, but instead a search for an explanation of the evidence against her. We accordingly hold that these comments did not transgress a clear and unequivocal rule of law and consequently do not meet the second requirement of the plain error standard.

[¶ 45] For the reasons stated above, we hold that Lafond was not denied a fair trial by the actions of the prosecutor. As explained, the comments to which Lafond objects on appeal do not meet the requirements of plain error. Therefore, reversal is not warranted.

### Written Statement

[¶ 46] Rulings on the admissibility of evidence are within the sound discretion of the trial court. *English v. State,* 982 P.2d 139, 143 (Wyo.1999). As such, decisions of the trial court are entitled to considerable deference; and, as long as a legitimate basis for the trial court's ruling exists, that ruling will not be reversed on appeal. *Id.* Additionally, we will not overturn a trial court's discretionary decision unless the court acted in a manner exceeding the bounds of reason and could not rationally conclude as it did.

*Id.; Simmers v. State,* 943 P.2d 1189, 1197 (Wyo.1997); *Vit v. State,* 909 P.2d 953, 956–57 (Wyo.1996). Furthermore, a district court's judgment may be affirmed on any proper legal grounds supported by the record. *English,* at 143.

[¶ 47] Lafond's second issue involves a written statement prepared by Ms. Major–Frunz. Prior to trial, Lafond provided the prosecution with a notice of alibi witness list. One of the people on this list was Ms. Major–Frunz. Before trial commenced, however, Ms. Major–Frunz was deployed overseas with her Guard unit. Several days prior to trial Lafond made a motion to admit a written statement from Ms. Major–Frunz. The written statement reads as follows:

To Whom It May Concern:

I Julie Major–Frunz do state that the following is true to the best of my knowledge. My name is Julie Major–Frunz and I am a Technical Sergeant in the Wyoming Air National Guard, assigned to the 187th AES. I was attending my drill weekend during the date of Aug 4–5, 2001. I reported for duty at 0700 on 8–5–01. I remember seeing Capt Anita LaFond in the hallway by the bathroom after roll call. The time was at 0715 am. We were both getting ready to go to the commander's call at 0730. I remember our conversation because we were talking about my child. Anita's son watches my child on drill weekend and she had been with her father during the summer. Anita was questioning if she was okay and if she would be home soon. I explained to Anita that she would be there the following month (Sep UTA) and that her son would have to watch her and they could go swimming in the Holiday Inn pool. We both went to commander's call together, which was at 0730. I know that Capt. LaFond was wearing her flight suit as it was Sunday of drill and we are usually scheduled to fly. Commander's call was approximately 15 or 20 Minutes that Sunday. We had Intel scheduled at 0800 that morning so we sat in the classroom. I do not remember Anita leaving or mentioning the fact that she had to leave for any reason.

Lafond claims it was error for the district court to rule that this written statement was inadmissible. We disagree.

[¶ 48] The written statement is clearly hearsay.[3] Hearsay evidence is ordinarily inadmissible, but can be received if it falls within one of the hearsay exceptions. *Johnson v. State*, 930 P.2d 358, 361–62 (Wyo. 1996). One of the exceptions to the hearsay rule, and the one Lafond claims the written statement falls under, is W.R.E. 804(b)(6).[4] A statement may be admitted under this section if it meets the following requirements:

First, the declarant must be unavailable. Second, the adverse party must either have been given pretrial notice or a sufficient opportunity to prepare for and contest the admission of the hearsay. Third, the truth of the matter asserted must be evidence of a material fact. Fourth, the hearsay statement must be more probative than any other evidence which could be procured through reasonable efforts. Fifth, and finally, the statement must be supported by circumstantial guarantees of trustworthiness; this may be established either through other corroborating evidence or by considering the motivation and/or behavior pattern of the declarant.

*Johnson*, at 366.

[¶ 49] The district court's first opportunity to consider the written statement occurred when, several days prior to trial, the defense made a motion to admit it. At a pretrial motion hearing on the motion, defense counsel stated that Ms. Major–Frunz was unavailable due to deployment and that the written statement met the criteria of Rule 804. De-

fense counsel then concluded with, "I can tell you in addition to this, Your Honor, we are calling four or five other witnesses that also will testify approximately to the same thing, and so this is just consistent with what other people are going to testify to this Court."

[¶ 50] After argument the court ruled: "Then going to the written statement, it seems to me that that clearly is inadmissible. It being a hearsay statement and made by [Defense Counsel] by his own admission is cumulative, but I think in the absence of any record, it's fairly easy to arrive at the conclusion that [the written statement] is inadmissible." We cannot find that this ruling was an abuse of discretion. Defense counsel did in fact state that other witnesses would testify to approximately the same thing. It was thus perfectly logical that the district court found the written statement to be cumulative and not "more probative on the point for which it [was] offered" than any other evidence. The district court consequently did not abuse its discretion by excluding the written statement at that time.

[¶ 51] Lafond also claims that the statement should have been admitted following the prosecutor's comments at trial. During cross-examination of Lafond the prosecutor asked, "Basically, as I heard the testimony, nobody can really vouch for your whereabouts between roll call and commanders call?" This question produced an objection that was overruled. At the end of cross-examination, defense counsel asked that the court reconsider its previous ruling on the admissibility of the written statement. Counsel argued that the prosecutor had opened the door when he asked whether

---

**3.** " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." W.R.E. 801(c).

**4.** W.R.E 804(b)(6) provides:

(b) *Hearsay exceptions.*—The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

(6) Other Exceptions—A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point

for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, his intention to offer the statement and the particulars of it, including the name and address of the declarant.

someone could account for Lafond's whereabouts. The district court responded by saying, "This case has been pending for a year almost. There would have been other ways under the circumstances you described to get this witness' testimony preserved. There's, just to record here, supporting the—theoretically, a hearsay statement offered for the truth and veracity of the matters in the statement, it's not admissible."

[¶ 52] We once again find the district court did not abuse its discretion in finding that the written statement did not qualify for admission. Lafond failed to meet several of the requirements for admission under this section. .Specifically, notice regarding the written statement was not given to the prosecutor until six days before trial. The written statement, in the form of a notarized letter, was dated in March, but the prosecutor did not get notice that defense counsel intended to use it until July 2, 2002. Lafond claims that notice was given to the State back in December. However, the notice given at that time was not that Lafond would be using the written statement, only that Ms. Major–Frunz was an alibi witness. The necessary notice must include the "intention to offer the statement and the particulars of it" so that the adverse party has a fair opportunity to prepare to meet it. W.R.E. 804(b)(6).

[¶ 53] Additionally, the written statement was not more probative than other evidence on the matter. The assertion in Ms. Major–Frunz's statement was that she went with Lafond to commander's call at 7:30 and sat with her in the classroom and did not recall Lafond leaving. This was not more probative than the live testimony of Mr. Orr who stated that both he and Lafond went to their desks at 7:30 and he did not notice her leaving prior to 8:00 a.m.[5] Additionally, more probative evidence could have been procured on this point through the use of a deposition. *See* W.R.Cr.P. 15. A deposition would have been more probative because it would have been under oath and subject to cross-examination. Clearly the fact that no deposition was taken was part of the district court's

concern when it noted that the defense had over a year to get the testimony preserved.

[¶ 54] Furthermore, the written statement does not contain circumstantial guarantees of trustworthiness. It was simply a notarized letter. The statement was not sworn to under oath, there is no indication of the circumstances under which it was made, no indication if the statement remained consistent, and no indication if it was ever retracted. *See Johnson,* 930 P.2d at 366. Furthermore, there is an indication that there was a significant lapse of time from the date of the incident to the date the letter was prepared. Such a lapse in time does not enhance the trustworthiness of the statement. Considering all these factors, we thus cannot conclude that the district court abused its discretion.

### Bank Records

[¶ 55] Lafond lastly argues that this court must not condone the State's unfettered access to her bank records. In this case the State introduced 21 checks written by the defendant. Lafond, however, claims that the government obtained and used these checks at trial in violation of her rights under the Wyoming constitution. She argues that the citizens of Wyoming have a legitimate expectation that their bank records will be protected under Article 1, § 4 of the Wyoming constitution.

[¶ 56] While Lafond has presented the analysis we have directed parties should supply when claiming that the Wyoming constitution provides more protection than the federal constitution, Lafond made no such argument to the trial court. *See Vasquez v. State,* 990 P.2d 476, 489 (Wyo. 1999). This court generally does not consider issues raised for the first time on appeal. *Belden v. State,* 2003 WY 89, ¶ 55, 73 P.3d 1041, ¶ 55 (Wyo.2003). Additionally, "[t]he burden of establishing plain error is assigned to the appellant even when the claimed error would constitute a violation of a constitutional right." *Id.; see also Bailey v. State,* 12

---

5. While these statements may seem somewhat contradictory because one states that she was in the classroom and the other states she was at her desk, Lafond testified that her desk is in the classroom.

P.3d 173, 177–78 (Wyo.2000). As a result, we again review the claim for plain error.

[¶ 57] The first requirement of the plain error standard is that the record must be clear as to the incident alleged as error. It is not completely clear how Lafond's checks were obtained. The record shows that there was a precipe for a subpoena deuces tecum and a returned subpoena. However, that subpoena did not include all the checks that were eventually introduced at trial. Ms. Krier testified that the checks were produced as a result of a warrant. Nevertheless, the record contains no such warrant. This puzzle aside, portions of Lafond's bank records are clearly in the record and were introduced at trial. For argument sake, and because it is not essential to our holding, we will thus proceed as if the first requirement of the plain error standard were met.

[¶ 58] The second requirement of the plain error standard is that there must be a transgression of a clear and unequivocal rule of law. The United State Supreme Court has decided that a person does not have a Fourth Amendment expectation of privacy in their banking or financial records. *United States v. Miller*, 425 U.S. 435, 440–43, 96 S.Ct. 1619, 1622–24, 48 L.Ed.2d 71 (1976). In *Fitzgerald v. State*, 599 P.2d 572, 577 (Wyo.1979), we expressly adopted this rule. We therefore hold that Lafond cannot meet the second requirement of the plain error standard. While, as Lafond points out, our opinion in *Fitzgerald* provided no analysis of the Wyoming constitution and it is possible that such an argument could be made, such an argument must be made at the trial level first.

## CONCLUSION

[¶ 59] For the reasons stated above, we affirm.